E-FILED
Thursday, 27 December, 2018 09:23:12 AM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CIVIL NO. _18-CV-4230_ |
| *ex rel.* Adam Knudsen, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | **FILED UNDER SEAL** |
| v. | § | PURSUANT TO 31 U.S.C. § 3730(b)(2) |
| | § | |
| | § | |
| KBR, INC., | § | **JURY TRIAL DEMANDED** |
| | § | |
| Defendant. | § | |

**RELATOR ADAM KNUDSEN'S ORIGINAL COMPLAINT**

## TABLE OF CONTENTS

I.  **Introduction** ........................................................................................................ 1

II.  **Introduction to Relator Adam Knudsen** .................................................... 3

   A.  Background on Relator ....................................................................... 3

   B.  Original Source ..................................................................................... 3

III.  **Defendant KBR, Inc.** ...................................................................................... 4

IV.  Respondeat Superior and Vicarious Liability ................................................ 4

V.  **Jurisdiction and Venue** ................................................................................ 5

VI.  **Regulatory Background** .............................................................................. 5

   A.  Applicable Federal Acquisition Regulations .................................... 5

   B.  "The Standard": Department of Defense Test Method Standard ........ 7

   C.  Army Firefighter Rules and Regulations .......................................... 8

VII.  **KBR Firefighter Operations in Iraq** ...................................................... 10

   A.  LOGCAP Overview ............................................................................ 10

   B.  History of KBR Firefighting in Iraq .................................................. 11

VIII.  **Camp Speicher and Relator's Discovery of Fraud** ............................ 12

   A.  Schedule Manipulation ...................................................................... 12

   B.  Unfit for Duty: Insufficient Fitness and Training ............................ 13

   C.  False Training Certifications ............................................................ 14

   D.  Camp Speicher Firefighters Lacked Operational Readiness ............ 15

   E.  Unqualified and Low-Paid Foreign Nationals .................................. 16

   F.  Billing Unnecessary Services ............................................................ 17

   G.  Continuation of Fraud at Camp Anaconda in Balad ........................ 18

IX.  **KBR's Retaliation Against Relator** ........................................................ 19

X.  **Actionable Conduct by Defendant KBR** ................................................ 21

   A.  False Claims Act ................................................................................ 21

B.   Defendant's Violations of the False Claims Act ................................................................. 22

    i.   Presentation of False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A)). .................... 22
    ii.  Making or Using False Records or Statements Material to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B)). ................................................................................................ 23
    iii. Retaliation (31 U.S.C. § 3730(h)) ................................................................................... 24

XI.   **Causes of Action** ............................................................................................................. 25

XII.  **Index of Exhibits** ............................................................................................................. 29

XIII. **Demand for Jury Trial** ................................................................................................... 29

Plaintiff/Relator Adam Knudsen ("Relator") brings this action pursuant to the False Claims Act, 31 U.S.C. §§ 3729–3732, and seeks to recover all damages, penalties, and other remedies established by the False Claims Act on behalf of the United States of America and on his own behalf.  Relator would respectfully show the following:

## I.     INTRODUCTION

1.      By the start of 2012, the United States military had withdrawn its troops from Iraq, but the defense contractors stayed.  Through contractors, the United States intended to help the Iraqi people with one last mission: to learn to secure their country on their own.

2.      When U.S. President Barack Obama met with Iraqi Prime Minister Nouri al-Maliki to commemorate the withdrawal of U.S. troops, they vowed to maintain strong security, diplomatic, and economic ties.  As President Obama proclaimed: "We have got an enormous investment of blood and treasure in Iraq, and we want to make sure that even as we bring the last troops out, it is well understood both in Iraq and here in the United States that our commitment to Iraq's success is going to be enduring."[1]

3.      President Obama identified one particular source of immediate cooperation: training for Iraq's use of F-16 fighters it purchased from the United States, along with the eventual potential for joint military exercises and joint counter-terrorism operations that the Iraqi F-16 program would bring.[2]

4.      To immediately assist with this cooperation, the U.S. Army hired defense contractors.  In particular, KBR, Inc. was hired to provide firefighter services.  KBR specifically

---

[1] Dan Robinson, *Obama, Maliki Hail 'New Chapter' for Iraq without US Troops*, VOICE OF AMERICA (Dec. 11, 2011 7:00 PM), https://www.voanews.com/a/obama-maliki-hail-new-chapter-for-iraq-without-us-troops-135449683/149460.html.

[2] *Id.*

1

contracted with the U.S. Army, through a LOGCAP IV task order, to provide Base Life Support services throughout Iraq, including Aircraft Rescue Firefighter services at numerous airfields. Those airfields included Camp Speicher (also known as the Tikrit Air Academy) and Balad Air Base (also known as Camp Anaconda).

5.     KBR hired Relator Adam Knudsen to assist with its mission, and he was initially stationed at Camp Speicher. He had already completed two missions while working for another contractor in Iraq. He previously provided fire suppression and Aircraft Rescue Firefighter support to help the United States shut down two bases for the troop withdrawal, Camp Delta Al Kut and Ayn al-Asad Airbase.

6.     KBR impressed upon its new employees the importance of the mission, but Relator Knudsen did not witness KBR's valiant participation in an American partnership with Iraq. Instead, Knudsen witnessed a bloated company taking advantage of the U.S. Army and the American taxpayer.

7.     During Knudsen's entire time at Camp Speicher, there were no F-16s (and thus no active F-16 program) for the firefighters to protect. Without planes to watch out for or American troops to answer to, KBR's firefighters wasted time and resources. They falsified hours and certifications while billing the Government for made-up and unnecessary firefighter tasks. In the meantime, their actual preparedness languished; they kept out of shape and generally became unfit for duty.

8.     The firefighters' lack of readiness was a foreboding omen. By summer 2014, Knudsen had transferred to another base, but ISIS had made Iraq a warzone all over again. Thousands of unarmed Iraqi recruits were at Camp Speicher, and they were massacred. On June 12, 2014, ISIS tragically murdered at least 1,566 Iraqi Air Force cadets at Camp Speicher.

2

9.     While firefighters alone probably could not have saved new recruits from a massive military attack, they should have at least done their jobs. Instead, KBR billed the United States for hours not worked and for sham tasks they cooked up to get paid—all of this on a task order worth more than $750 million.

10.     Accordingly, Relator seeks to file an action under the False Claims Act in the name of the United States and to recover civil penalties and damages arising from KBR's egregious misconduct.

## II.     INTRODUCTION TO RELATOR ADAM KNUDSEN

### A.     BACKGROUND ON RELATOR

11.     Plaintiff/Relator Adam Knudsen ("Knudsen" or "Relator") has years of experience as a firefighter, including five to six years of service in Iraq.

12.     Relator was hired on July 20, 2011 by Sallyport Global Holdings to be a firefighter in Iraq, and on May 10, 2012, Knudsen was hired by Service Employees International, Inc., a subsidiary of KBR Group Holdings, LLC, to continue firefighting in Iraq.[3]

13.     On February 23, 2014, Knudsen injured his ankle during a structure fire. For days after his injury, KBR assigned Knudsen dispatch shifts—the same shifts he was frequently assigned after first making fraud complaints to the KBR ethics hotline. Shortly after, however, Knudsen was terminated from his employment. He is still recovering from his injury.

### B.     ORIGINAL SOURCE

14.     There are no bars to recovery under 31 U.S.C. § 3730(e), or in the alternative, Relator is an original source as defined therein. Relator has direct and independent knowledge of the information on which his allegations are based. To the extent that any allegations or

---

[3] KBR Group Holdings, LLC operates as a subsidiary of KBR, Inc.

transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions and has provided this information to the United States prior to filing a complaint by serving a voluntary pre-filing disclosure statement on December 14, 2018.

15.    As required pursuant to 31 U.S.C. § 3730(b) and (e), Relator submitted an Original Disclosure Statement to the Attorney General of the United States and the United States Attorney for the Central District of Illinois, as well as all material evidence and information, contemporaneously with the service of his Original Complaint.

### III.    DEFENDANT KBR, INC.

16.    KBR, Inc. (KBR) is a global engineering and construction company incorporated in Delaware with corporate headquarters in Houston, Texas.  KBR's corporate headquarters are at 601 Jefferson St., Houston, Texas 77002.  KBR also transacts business at the Rock Island Arsenal, Building 332, Rock Island, Illinois 61299.  KBR is the world's largest defense services provider and the largest contractor supporting U.S. military efforts in Iraq, but their relationship with the U.S. Army has been mired with controversy and expanding costs.

### IV.    RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

17.    Any and all acts alleged herein to have been committed by Defendant were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the defendant and within the course and scope of their employment, or by corporate predecessors to whom successive liability applies.

## V.   JURISDICTION AND VENUE

18.   This action arises under the False Claims Act, 31 U.S.C. §§ 3729–33. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732.

19.   This Court has personal jurisdiction under 31 U.S.C. § 3732(a), which authorizes nationwide service and process, and because the Defendant can be found in and transacts the business that is the subject matter of this lawsuit in the Central District of Illinois.

20.   Venue is proper in the United States District Court for the Central District of Illinois, pursuant to 28 U.S.C. § 1391(b)–(c) and 31 U.S.C. § 3732(a), because the Defendant transacts business in this district and because the United States Army Sustainment Command, which is the contracting agency for the LOGCAP IV contract, is headquartered at Rock Island Arsenal at Rock Island, Illinois, within the Central District of Illinois.

## VI.   REGULATORY BACKGROUND

A.   APPLICABLE FEDERAL ACQUISITION REGULATIONS

21.   The Federal Acquisition Regulations ("FAR") is a system of regulations jointly issued by the Department of Defense, the U.S. General Services Administration, and the National Aeronautics and Space Administration for use in acquiring goods and services in a uniform manner for government contracts. FAR is codified in Title 48 of the United States Code of Federal Regulations.

22.   FAR places with the Government contractor the ultimate burden of implementing a quality control system that ensures that products and services "acquired under Government contract conform to the contract's quality and quantity requirements." 48 C.F.R § 46.000. Compliance with contract requirements is a key part of the quality control process.

23.     Notably, 48 C.F.R § 46.105 outlines the contractor's responsibilities to control quality.   Pursuant to 48 C.F.R § 46.105(a), the "contractor is responsible for carrying out its obligations under the contract by: (1) controlling the quality of supplies or services; and, (2) tendering to the Government for acceptance only those supplies or services that conform to contract requirements.  The control of quality by the contractor may relate to, but is not limited to: "(3) Testing and examination, to ensure that the practices and equipment provide the means for optimum evaluation of the characteristics subject to inspection; (4) Reliability and maintainability assessment (life, endurance, and continued readiness); and,…(8) Procedures and processes for services to ensure that services meet contract performance requirements." 48 C.F.R. 46.105(c). The contractor is responsible for performing all inspections and test required by the contract except those specifically reserved for performance by the Government. 48 C.F.R. 46.105(d).

24.     Because FAR's contract compliance and quality control requirements are compulsory, the Government typically does not inspect the services and/or products that it acquires from contractors.  Instead, the Government relies on the contractor to accomplish all inspection and testing needed to ensure that the products and/or services provided to the Government conform to the applicable contract. 48 C.F.R. § 46.202-2(a).

25.     48 C.F.R § 32.905(a) establishes that basis for payment is on receipt of a proper invoice and satisfactory contract performance. With the limited exception of interim payments on cost-reimbursement contracts for services, all invoice payments must be supported by a receiving report or any other Government documentation authorizing payment. 48 C.F.R. § 32.905(c).

26.     The general FAR invoice requires the contractor to certify that the voucher is proper.  Specifically, Standard Form 1034 states, before the contractor's signature line: "I certify that this voucher is correct and proper for payment." 48 C.F.R. § 53.301-1034. By certifying that

6

the voucher is proper for payment, the contractor certifies that the voucher is a good faith request for payment in accord with the contract.

27.     Finally, FAR requires Government contractors to disclose when there is evidence that regulations have been violated.  48 C.F.R. § 52.203-13.  To be effective, the disclosure must specifically state that it is being made in accordance with FAR's mandatory disclosure provisions and that the contractor has credible evidence that an offense has occurred subject to the mandatory disclosure provisions. *Id.*  Also, the disclosure must occur before an investigation, and within thirty days of the putative violation, in order to take advantage of the provision in the FCA that rewards timely self-disclosures with a limit of double rather than treble damages.

B.     "THE STANDARD": DEPARTMENT OF DEFENSE TEST METHOD STANDARD

28.     The Department of Defense (DOD) underscored the importance of FAR's quality control requirement when, in 1996, the DOD adopted MIL-STD-1916, also referred to as "the Standard."  The Standard emphasizes the care that a defense contractor must exercise when supplying goods and services to the Government and the need for the contractor to implement efficient and effective quality control and procedures to prevent defects.  The Standard also emphasizes that, even if there are quality control systems in place, the system does not relieve the contractor from ensuring that the product and/or services provided to the Government comply with the applicable contract requirements.  Relevant here, the Standard provides:

> 1.4 Product requirements. The contractor is required to submit product that meets all contract and specification requirements. ***The application of the quality plans or procedures of this standard does not relieve the contractor of responsibility for meeting all contract product requirements***. The contractor's quality system, including manufacturing processes and quality control measures, will be established and operated to consistently produce products that meet all requirements. Absence of any inspection or process control requirement in the contract ***does not relieve the contractor of responsibility for assuring that all products or supplies submitted to the Government for acceptance conform to all requirements of the contract.***

4.3 Disposition of nonconforming product. All units of product found to be nonconforming by the contractor shall be removed and kept apart from the flow of production or otherwise identified or segregated to preclude submission to the Government. The contractor may rework or repair these units unless the contract excludes such activities. Corrected product shall be screened by the contractor and resubmitted to the Government apart from the regular flow of the product.[4]

C.  ARMY FIREFIGHTER RULES AND REGULATIONS

29.     To comply with various statutory and regulatory laws, the Department of Defense has issued Department of Defense Instruction (DODI) 6055.06, relating to the "DoD Fire and Emergency Services (F&ES) Program."[5]  DODI 6055.06 applies to all DoD operations and installations worldwide, including contractor-operated facilities.  DODI 6055.06 at § 2.2.

30.     To implement DODI 6055.06, the Army has also issued Chapter 25 of Army Regulation (AR) 420-1.  AR 420-1 "addresses the management of Army facilities," and Chapter 25 "prescribes Army policies and responsibilities covering all firefighting." AR 420-1 at 1, 275.[6]

31.     AR 420-1 requires diligent maintenance of firefighter quality, including annual self-inspections using the Army's checklist for official operational readiness inspections.  *Id.* at 277.  These inspections support the ratings in an annual Installation Status Report made to the U.S. Army.  *Id.*

32.     The regulation also requires consistent training—a minimum of 120 hours of proficiency training per year for each fire department member, with their training results to be maintained on official Department of the Army forms.  *Id.* at 280.

---

[4] Department of Defense, *Dep't of Defense Test Method Standard: DOD Preferred Methods for Acceptance of Product, MIL-STD-1916* (1996) (emphasis added), *available at* http://www.variation.com/files/standards/milstd1916.pdf.

[5] Department of Defense, DODI 6055.06 (2006), *available at* https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/605506p.pdf.

[6] Available at https://armypubs.army.mil/epubs/DR_pubs/DR_a/pdf/web/r420_1.pdf.

8

33.     AR 420-1 insists upon the best equipment for firefighters, including personal protective equipment meeting certain standards and portable radios provided to the firefighters. *Id.* at 277.

34.     DODI 6055.06 and AR 420-1 each require Army firefighters, including contractors, to comply with relevant guidance from the National Fire Protection Association (NFPA) and other national standards.  In particular, the Instruction requires implementation of a "Fitness and Wellness Program" based on DoD requirements and guidance from NFPA 1500, 1582, and 1583 as well as the International Association of Fire Chiefs/International Association of Fire Fighters Wellness Initiative.  DODI 6055.06 at §§ 6.1, 6.7; *see also* AR 420-1 at 278–79.

35.     The mandated NFPA guidance requires an "exercise and fitness training program" consisting of numerous workout requirements, including aerobic exercise, muscular resistance, flexibility exercise, and individualized exercise prescriptions.  NFPA 1583 at ¶ 7.1.[7]

36.     The International Association of Fire Chiefs/International Association of Fire Fighters Wellness Initiative is even more specific in its mandate for regular physical exercise:

> **It is necessary to provide dedicated on-duty time for exercise to assist in promoting physical fitness.** While scheduling on-duty time may vary due to emergency calls, training, and other duties, **it is recommended that 60-90 minutes be allotted during every shift.** Uniformed personnel working administrative shifts, 40-hours or otherwise, shall also be provided the opportunity to exercise. The health, fitness, and wellness of all uniformed personnel must be viewed as a priority. The Wellness-Fitness Initiative holds forth the idea that labor and management should work together to ensure full participation by all uniformed personnel.[8]

37.     The Army and DoD quality regulations are particularly critical for aircraft rescue firefighters, such as the ones provided by KBR, because those firefighters have higher

---

[7] NFPA guidance is available at https://www.nfpa.org/codes-and-standards/.

[8] *The Fire Service Joint Labor Management Wellness-Fitness Initiative* (2018), *available at* https://www.iafc.org/docs/default-source/1safehealthshs/wfi-manual.pdf.

expectations. Army regulations also illuminate the high standards for aircraft rescue firefighting staffs. In the event of an unannounced emergency, AR 420-1 calls for a three-minute response time from aircraft rescue firefighters. AR 420-1 at 283. Those three minutes include one minute for call processing, one minute for turnout time, and one minute for travel time. *Id.* Announced emergency exercises allow for only a one-minute response time. *Id.*

38.     Given these high expectations, AR 420-1 requires that such "[g]arrisons will ensure that apparatus are properly staffed with trained, qualified, and certified personnel." *Id.*

## VII.     KBR FIREFIGHTER OPERATIONS IN IRAQ

### A.     LOGCAP OVERVIEW

39.     The Logistics Civil Augmentation Program ("LOGCAP") is the United States Department of Army's ("U.S. Army") program to provide the basic supports for life to the troops living on bases overseas. LOGCAP began in its current form in 1992, when the LOGCAP I contract was awarded to Brown and Root Services (now KBR, Inc.). LOGCAP I was used to support the U.S. Army in numerous affairs throughout the world, including operations in Somalia, Bosnia, Kosovo, and Rwanda. LOGCAP II was then awarded in 1997 to DynCorp to support the U.S. Army in places such as Guatemala, Columbia, and the Philippines.

40.     In 2001, KBR was awarded LOGCAP III, which primarily supported the War on Terror in Iraq and Afghanistan. LOGCAP III was mired in controversy, with KBR at the center.

41.     The fourth iteration of the program—LOGCAP IV—was issued in 2009, and it provides for support to the United States military personnel stationed in Afghanistan, Kuwait, and Iraq.   Due to concerns regarding cost overruns and performance, as well as general unaccountability of millions of dollars under the LOGCAP III program, the U.S. Army contracted with three prime contractors rather than just one: DynCorp, Fluor, and KBR.  In order to maintain continual competition and prevent similar fiscal abuses that occurred under LOGCAP III, the three

10

companies under LOGCAP IV must compete for each available task order issued by the U.S. Army.

B.   HISTORY OF KBR FIREFIGHTING IN IRAQ

42.   LOGCAP III created the exclusive opportunity for KBR to provide firefighting services in Iraq. With the monopoly, KBR primarily provided firefighting services through subcontractors.

43.   One of the subcontractors that worked with KBR in Iraq was Wackenhut Services LLC. In 2010, the United States, through a *qui tam* relator, sued KBR and Wackenhut for fraud allegations related to their firefighter services in Iraq under LOGCAP III.[9] The United States alleged that from 2008 to 2010, Wackenhut and KBR committed fraud by double billing the Government and inflating costs. In 2016, the United States and Wackenhut—then known as Centerra Services International—settled the False Claims Act case for $7.4 million.[10]

44.   DynCorp and Flour won many of the initial LOGCAP IV task orders, but KBR was granted a LOGCAP IV task order in August 2011 after a full and open competition: the "Post 2011 Base Life Support" Task Order. This was an Iraq-specific task order, and it included the provision of firefighting services in Iraq. The United States has incurred $764,250,912 in bills owed and paid to KBR for this task order.

45.   KBR is still providing firefighting services in Iraq, as a newer LOGCAP IV task order was recently exercised for a third option year.

---

[9] *United States ex rel. Reno v. Kellogg Brown & Root, Inc. and Wackenhut Servs., LLC*, 1:10-cv-00504 (E.D. Tex.).

[10] Press Release, Dep't of Justice, Florida-Based Centerra Services International Inc. Agrees to Pay $7.4 Million to Settle False Claims Act Allegations Related to Wartime Conduct (Feb. 1, 2016), *available at* https://www.justice.gov/opa/pr/florida-based-centerra-services-international-inc-agrees-pay-74-million-settle-false-claims.

## VIII.   CAMP SPEICHER AND RELATOR'S DISCOVERY OF FRAUD

46.     When Knudsen began working for KBR in 2012, he was stationed at Camp Speicher in Tikrit, Iraq. KBR was under contract to provide firefighter support for the F-16 mission, yet F-16s did not arrive while Knudsen was there.

A.     SCHEDULE MANIPULATION

47.     Knudsen first noticed indicia of fraud almost immediately, because it directly impacted him. KBR set "in house" rules for hours—approved by Fire Chief Leroy Richardson— that appeared arbitrary and beneficial to the chiefs. Regular firefighters were limited to only 84 hours of work per week, but the chiefs' hours sometimes went over 120 hours per week. This violated KBR's duty to provide proper, necessary, and efficient services to the U.S. Army.

48.     In particular, the chiefs spent extra time working on the fire apparatus (fire trucks), but Knudsen often witnessed Chief Richardson log time despite not wearing his bunker pants or spend these hours smoking. In fact, in the summer of 2013 Chief Richardson openly stated to several firefighters—Knudsen as well as firefighters Edward Pink and Justin Sturm—that he never planned to directly respond to dispatch calls for fire fighter support. Instead, Chief Richardson indicated he would respond to a dispatch call by telling the dispatch worker to replace him at the fire apparatus and then observe the firefighters from a separate "chief's vehicle." The dispatch room was about 70 yards away from the station for the fire apparatus, so this process would slow everyone down. Indeed, Knudsen heard that when he was away for rest and recuperation (R&R), Camp Speicher's response to a fire was actually slowed down by this convoluted process.

49.     The chiefs thus made extra overtime pay at the firefighters' and taxpayers' expense. According to the firefighters' contracts with KBR, they were paid a base salary "on the basis of a minimum 40-hour workweek," but paid an hourly overtime rate past 40 hours. Ex. 1 at 3. The

hourly rate for any individual was a function of their base salary, however, and their base salary was "based upon individual job classification." *Id.* at 2–3. Because the chiefs have a higher job classification than regular firefighters, this schedule manipulation resulted in tens if not hundreds of hours per week billed to the United States at higher hourly rates than would occur if schedules were properly spread out among all firefighters. This manipulation would be improper in any other line of work: for example, a client would not allow the top partners at a law firm to bill the majority of time on a case while completing tasks that associates and even secretaries can do, such as making copies or even preparing a simple motion for extension of time.

50.    Whenever he was generally asked about the scheduling, Chief Richardson would state, "it is what it is." But if anyone questioned the efficacy of the scheduling, they would be quickly threatened by a suggestion of insubordination. In fact, in the summer of 2013, when firefighters actually did question this practice, the Relator and other complaining firefighters (Edward Pink, Justin Sturm, and Anthony Krause) found themselves with extra dispatch shifts.

51.    The one chief who was receptive to schedule-manipulation complaints was Assistant Chief Joe Graves. He told the firefighters that he wished for a more fair process, but he was caught between a rock and a hard place—although he had his own views on Camp Speicher's scheduling, he did not wish to oppose the KBR policy put in place by those above him.

B.    UNFIT FOR DUTY: INSUFFICIENT FITNESS AND TRAINING

52.    Many firefighters and chiefs refused to participate in Physical Training despite being required to do so by regulatory mandates. They simply forged their Physical Training hours in the daily logs.

53.     Early on in his time at KBR, Knudsen realized that many of the firefighters did not work out at all or worked out only very briefly.  It was an easy thing to realize when he lived in such close proximity to all his fellow firefighters.

54.     Knudsen discovered the forgeries during one of his assigned details.  As part of his duties, he converted handwritten time logs into an electronic log.  When Knudsen questioned the hours he knew were false, however, he was waived off with comments such as, "You don't actually watch everyone in the gym" or "mind your own business."  He also found himself assigned extra dispatch work or extra shifts cleaning everyone's equipment.  Because Knudsen's job was just to digitize written hour logs, however, the hours were never changed and were part of the overall hours KBR submitted to the United States.

55.     The lack of physical training by some of his coworkers was in stark contrast to other firefighters, such as Anthony Krause, who worked out more than he was required to do so.  Krause frequently complained about how so few others pulled their weight in this regard.

C.     FALSE TRAINING CERTIFICATIONS

56.     Numerous firefighters relied on false training certifications to obtain promotions within KBR.  Relator knew this was possible, because in his prior job, Sallyport insisted he obtain a "Driver Operator" certification, and Sallyport assisted him in providing false information about his training to obtain the certification more efficiently.   Knudsen was actually capable of completing the duties of a "Driver Operator" and did not get paid any more for having that certification than he would have been otherwise, but at KBR he witnessed officers unable to perform the functions as their certifications suggested.

57.     As a result, many firefighters were permitted to use equipment without knowing how to properly operate it.  Crew chiefs would have Captain-level certifications without knowing

14

how to properly load hose, for example. Some personnel would possess Mobile Water Supply certifications without knowing how to draft. In particular, Knudsen noticed Chief Michael McCann was unable to perform many regular firefighter duties.

58.     Firefighters were incentivized to obtain these certifications, because they were required for promotions and, therefore, any pay increases. KBR thus submitted claims for paying unqualified officers on the basis of false training certificates. A firefighter who obtained such a promotion would get paid tens of thousands of dollars more on an annual basis than they would have been paid otherwise. And because of Camp Speicher's schedule manipulation favoring the chiefs, a crew chief might have even been paid over $100,000 more annually than he would have been without false training certificates.

D.    CAMP SPEICHER FIREFIGHTERS LACKED OPERATIONAL READINESS

59.     Given the lack of physical training and the prevalence of false training certifications, KBR's firefighters at Camp Speicher lacked operational readiness. But KBR hid this condition through false reports and inspections.

60.     The firefighters were so unfit for duty that many were uncertain that they would be up to the task of handling a serious fire. One firefighter, Gary Staples, even stated throughout 2013 that he would quit if there were a serious fire. Another firefighter named Mickelez also implied he might quit in the summer of 2013. When Knudsen returned from R&R in late 2013, he learned that there was actually a fire where Staples "dropped out"—Staples took off his helmet and jacket and just sat on the sidelines as the other firefighters performed the work.

61.     In response to the operational readiness concerns, Knudsen and other firefighters lodged complaints with a KBR ethics hotline about the fake training certifications, the lack of proper physical training, and the schedule manipulations.

62.     In response to ethics complaints, KBR sent Chief Michael McCann and Fire Lead Ken Sprauge to investigate Camp Speicher.  They conducted an operational readiness inspection (which is regularly required by Army regulations) but gave passing ratings to everyone—even to personnel who could not do basic parts of their job, such as tying knots, dragging and loading hose, throwing ladders, or just donning their Personal Protective Equipment at the appropriate times.

63.     The combination of schedule manipulation, unqualified chiefs, unfit firefighters, and other operational readiness concerns seriously jeopardized KBR's ability to ever meet the response times for emergencies—3 minutes, according to Army Regulation 450-1, Table 25-2. The response time included 1 minute for turnout and 1 minute for travel time, but KBR's firefighters frequently failed to live up to this standard.  Often, KBR firefighters were not even close to meeting these response times.

64.     Camp Speicher's operational readiness was so deficient that Knudsen found himself taking part in side conversations at the regular morning meetings, where more serious firefighters informally discussed the extra precautions they would need to take in the event of a particularly dangerous fire.  These firefighters knew they could not rely on everyone in an actual emergency, so they needed contingency ideas.  Even a couple crew chiefs—Tim Ward and Charles Carrington—were involved in some of these conversations.  Carrington actually left Camp Speicher as soon as an opportunity presented itself, despite being offered a higher paying position at Camp Speicher, due to the unhealthy dysfunction there.

E.     UNQUALIFIED AND LOW-PAID FOREIGN NATIONALS

65.     In 2013, KBR began hiring unqualified foreign nationals to do every manner of job at Camp Speicher, such as security personnel and other laborers, as well as firefighters.  Knudsen noticed foreign nationals on the base from Ecuador, Mexico, Bosnia, Sri Lanka, and Uganda.

16

66.     Knudsen worked specifically with two foreign nationals: firefighters Gabriel Isquirdo and Diego Rivas. They were paid one-fourth the base salaries of American workers, and they were not qualified to work for the U.S. Army in a war zone. KBR thus overbilled the United States for their services.

F.      BILLING UNNECESSARY SERVICES

67.     KBR conducted fire inspections on vacant and abandoned buildings and billed the Government for it. These buildings were clearly unusable and often ransacked, but inspections were still conducted and hours billed for them. Furthermore, KBR frequently replaced smoke detectors, batteries, fire extinguishers, and other supplies inside these abandoned buildings, despite the lack of use. Each item replaced was billed to the U.S. Army.

68.     Image 1 depicts one of the vacant buildings that KBR inspected. Not only was it completely vacant, but it was "outside the wire"—beyond the security-protected confines of Camp Speicher.



**Image 1**

69.     Many old, rusty, and/or expired fire extinguishers throughout Camp Speicher were improperly repurposed for further use. The firefighters spent much of their time mixing expired agents, refilling the expired extinguishers with this mixed agent, and repressurizing the extinguishers. This activity not only created hazards for the firefighters who worked with the expired chemical agents, but it also endangered the entire camp with ineffective extinguishers.

G.     CONTINUATION OF FRAUD AT CAMP ANACONDA IN BALAD

70.     In late 2013, Relator was transferred to Camp Anaconda in Balad, Iraq. At Camp Anaconda, Knudsen witnessed much of the same type of fraudulent behavior that he saw at Camp Speicher.

71.     KBR provided firefighters with inadequate equipment at Camp Anaconda. The firefighters did not even have radios, for instance, despite regulatory requirements to give firefighters proper equipment.

72.     In particular, KBR at Camp Anaconda continued inspecting vacant and abandoned buildings, such as the ones pictured in Image 2, while billing the time and supplies to the United States.



**Image 2**

## IX.   KBR'S RETALIATION AGAINST RELATOR

73.   Relator joined KBR in May 2012 after years of firefighting service, including almost a year already in Iraq.  He had already completed two separate firefighting jobs in Iraq without incident.  Upon joining KBR at Camp Speicher, Knudsen worked hard to help prepare Iraq for its own protection after the U.S. withdrawal of troops.

74.   Soon after arriving, Relator noticed numerous indicia of fraud.  In particular, Knudsen noticed how the chiefs manipulated schedules, how workout hours were falsified, and how KBR often sent him and other firefighters to inspect abandoned buildings.  Between 2012 and 2013, he placed about a half dozen calls to KBR's ethics line to complain about the schedule manipulation and inspections of vacant buildings.   In the summer of 2013, Knudsen also complained about the schedule manipulation in person to Chief Richardson.  And when he noticed

19

false workout logs, Knudsen complained to his immediate supervisor at the time as well as some of the firefighters who wrote the logs.

75. Shortly after Knudsen first complained, he found himself with more dispatch shifts that put him in a solitary room for 12 hours per day—7 days per week. The dispatch shifts would sometimes be overnight, seriously disrupting Knudsen's sleep cycle. During these dispatch shifts, Knudsen was by himself, so his increased dispatch duties isolated him and even demoralized him at times.

76. Knudsen found himself with extra equipment-washing duties, as well. While all regular firefighters had to clean personal protective equipment, Knudsen was required to do so more often than the average firefighter.

77. KBR also decreased Knudsen's pay by decreasing his overall monthly hours. Knudsen went from potentially 100 hours or more per week to 84 or fewer hours per week, resulting in approximately $1,138 less pay per month.

78. When another company took over the contract for Camp Speicher, Chief Leroy Richardson refused to recommend Knudsen for the transition and ordered him off the base. Instead, Knudsen was forced to be stationed at Camp Anaconda, where he had improper equipment and suffered in substandard living conditions.

79. As a direct result of his complaints, KBR terminated Knudsen's employment rather than allow him to continue his duties and employment with the proper medical care. To this day, is still recovering from his injury and fighting with KBR's insurer over proper medical treatment.

## X.  ACTIONABLE CONDUCT BY DEFENDANT KBR

A.  FALSE CLAIMS ACT

80.     This is an action to recover damages and civil penalties on behalf of the Government and the Relator arising from false and/or fraudulent statements, claims, and acts by KBR made in violation of the False Claims Act, 31 U.S.C. §§ 3729–32.

81.     The FCA provides that any person who

(A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim

is liable to the Government for a civil penalty of not less than $11,181 and not more than $22,363 for each such claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claim.  *See* 31 U.S.C. § 3729(a)(1).

82.     The FCA defines "claim" as:

(A)     [] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

(i)     is presented to an officer, employee, or agent of the United States; or

(ii)    is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(I)     provides or has provided any portion of the money or property requested or demanded; or

(II)    will reimburse such contractor, grantee, or other recipient for any portion of the       money or property which is requested or demanded. . . .

31 U.S.C. §3729(b)(2).

83.     The FCA allows any persons having knowledge of a false or fraudulent claim against the Government to bring an action in federal district court for themselves and for the

Government and to share in any recovery as authorized by 31 U.S.C. § 3730. The FCA also protects a whistleblower who has suffered retaliation because of his efforts to stop one or more violations of the False Claims Act. *See* 31 U.S.C. § 3730(h).

84.     Based on these provisions, Relator Knudsen, on behalf of the United States and on his own behalf, seeks through this action to recover damages and civil penalties arising from Defendant's violations of the False Claims Act.

B.     DEFENDANT'S VIOLATIONS OF THE FALSE CLAIMS ACT

     i.     Presentation of False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A)).

85.     From at least 2012 to the present, KBR knowingly presented false or fraudulent claims for payment or approval to the United States Government for costs associated with firefighting services in Iraq.

86.     Specifically, KBR submitted claims to the Government seeking reimbursement for work that was not actually performed. Each time KBR submitted an invoice to the government that covered physical-training hours, for example, it submitted a false claim. KBR also submitted invoices for payment to chiefs and other high-ranking firefighters who did not meet the proper requirements.

87.     KBR also submitted claims to be reimbursed for unnecessary products and services, particularly when it billed time for its inspections of vacant buildings, for the supplies purchased for those buildings, or for refilling ineffective and expired fire extinguishers.

88.     KBR overbilled the government when, through its schedule manipulation, it billed for higher-paying officer hours when the work of regular firefighters would have been completely appropriate. KBR also overbilled the United States when it submitted invoices for actually-underpaid and unqualified foreign workers.

89.     Further, KBR submitted false claims by requesting payment for unqualified firefighters.  KBR submitted claims for payment for officers who did not have the qualifications claimed by them and for foreign-national firefighters who did not meet minimum qualifications.

90.     By submitting its invoices, KBR falsely represented and impliedly certified to the United States that its firefighting services met the contract's specifications and regulatory requirements.  KBR also expressly certified on its invoices that the vouchers were "proper for payment"—that is, that the invoices were good faith requests for payment in accord with the contract.  Yet KBR knew, through its own inspections and falsified documents, that this was not the case.

91.     Given the structure of LOGCAP IV work, KBR's knowing submission, or causation of submission, of false or fraudulent claims had the potential to influence the Government's payment decision and was material to the Government's decision to pay the claims.

92.     KBR's presentment of false or fraudulent claims were foreseeable factors in the United States' loss and a consequence of KBR's schemes.  Due to KBR's actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

ii.  Making or Using False Records or Statements Material to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B)).

93.     From at least 2012 to the present, KBR knowingly made or used false records or statements material to false or fraudulent claims paid or approved by the Government.

94.     The hours recorded and billed to the United States were false, due to schedule manipulation and the falsification of physical-training logs.  Despite Relator and others notifying KBR of this falsification, KBR used the logs as they were, unchanged.   KBR also used false training certificates to increase its reimbursement for firefighter "officers."

95.     After KBR conducted regular inspections, KBR made use of inspection reports that falsely showed operational readiness, despite the fact that KBR's firefighters were largely unfit for duty, unqualified, and subject to schedule manipulation that impeded their work ability.  With false inspection reports, KBR also created or helped create false Installation Status Reports.

96.     KBR's inspections were false, because KBR falsely represented and impliedly certified to the United States that its firefighting services met the contract's specifications and regulatory requirements.  KBR also expressly certified on its invoices that the vouchers were "proper for payment"—that is, that the invoices were good faith requests for payment in accord with the contract.  Yet KBR knew, through its own inspections and falsified documents, that this was not the case.

97.     Given the structure of LOGCAP IV work, KBR's making or use of false records and statements had the potential to influence the Government's payment decision and was material to the Government's decision to pay the claims.

98.     KBR's making or use of false records and statements were foreseeable factors in the United States' loss and a consequence of KBR's schemes.  Due to KBR's actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

iii.     Retaliation (31 U.S.C. § 3730(h))

99.     Section 3730(h) of Title 31 of the U.S. Code defines whistleblower protection under the FCA as follows:

>   (1) Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, or agent on behalf of the

24

> employee, contractor, or agent or associated others in furtherance of
> efforts to stop 1 or more violations of this subchapter. . . .
>
> (2)   Relief … shall include reinstatement with the same seniority status
>        that employee, contractor, or agent would have had but for the
>        discrimination, 2 times the amount of back pay, interest on the back
>        pay, and compensation for any special damages sustained as a result
>        of the discrimination, including litigation costs and reasonable
>        attorneys' fees.

31 U.S.C. § 3730(h).

100.    As discussed *supra*, Defendant placed Knudsen in harsh working conditions, refused to recommend him for advancement, terminated him, and impeded his ability to receive proper medical care as a result of his multiple complaints about Defendant's schedule manipulation, use of false workout logs, and unnecessary inspections of vacant buildings.

101.    Knudsen has suffered economic loss as a result of Defendant's retaliatory termination and is entitled to relief pursuant to 31 U.S.C. § 3730(h).

## XI.    CAUSES OF ACTION

### A.    COUNT I – PRESENTMENT OF FALSE OR FRAUDULENT CLAIMS (31 U.S.C. § 3729(A)(1)(A))

102.    Relator alleges and incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

103.    From at least 2012 to the present, KBR knowingly presented false or fraudulent claims for payment or approval to the United States Government for costs associated with firefighting services in Iraq.

104.    Specifically, KBR submitted claims to the Government seeking reimbursement for work that was not actually performed.  Each time KBR submitted an invoice to the government that covered physical-training hours, for example, it submitted a false claim.  KBR also submitted invoices for payment to chiefs and other high-ranking firefighters who did not meet the proper requirements.

105.    KBR also submitted claims to be reimbursed for unnecessary products and services, particularly when it billed time for its inspections of vacant buildings, for the supplies purchased for those buildings, or for refilling ineffective and expired fire extinguishers.

106.    KBR overbilled the government when, through its schedule manipulation, it billed for higher-paying officer hours when the work of regular firefighters would have been completely appropriate.  KBR also overbilled the United States when it submitted invoices for actually-underpaid and unqualified foreign workers.

107.    Further, KBR submitted false claims by requesting payment for unqualified firefighters.  KBR submitted claims for payment for officers who did not have the qualifications claimed by them and for foreign-national firefighters who did not meet minimum qualifications.

108.    By submitting its invoices, KBR falsely represented and impliedly certified to the United States that its firefighting services met the contract's specifications and regulatory requirements.  KBR also expressly certified on its invoices that the vouchers were "proper for payment"—that is, that the invoices were good faith requests for payment in accord with the contract.  Yet KBR knew, through its own inspections and falsified documents, that this was not the case.

109.    Given the structure of LOGCAP IV work, KBR's knowing submission of false or fraudulent claims had the potential to influence the Government's payment decision and was material to the Government's decision to pay the claims.

110.    The United States paid the false or fraudulent claims.

111.    KBR's presentment of false or fraudulent claims were foreseeable factors in the United States' loss and a consequence of KBR's schemes.  Due to KBR's actions, the United States

26

has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

B.   COUNT II – MAKING OR USING FALSE RECORDS OR STATEMENTS MATERIAL TO FALSE OR FRAUDULENT CLAIMS (31 U.S.C. § 3729(A)(1)(B))

112.   Relator alleges and incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

113.   From at least 2012 to the present, KBR knowingly made or used false records or statements material to false or fraudulent claims paid or approved by the Government.

114.   The hours recorded and billed to the United States were false, due to schedule manipulation and the falsification of physical-training logs.   Despite Relator and others notifying KBR of this falsification, KBR used the logs as they were, unchanged.   KBR also used false training certificates to increase its reimbursement for firefighter "officers."

115.   After KBR conducted regular inspections, KBR made use of inspection reports that falsely showed operational readiness, despite the fact that KBR's firefighters were largely unfit for duty, unqualified, and subject to schedule manipulation that impeded their work ability.   With false inspection reports, KBR also created or helped create false Installation Status Reports.

116.   KBR's inspections were false, because KBR falsely represented and impliedly certified to the United States that its firefighting services met the contract's specifications and regulatory requirements.   KBR also expressly certified on its invoices that the vouchers were "proper for payment"—that is, that the invoices were good faith requests for payment in accord with the contract.   Yet KBR knew, through its own inspections and falsified documents, that this was not the case.

117.     Given the structure of LOGCAP IV work, KBR's making or use of false records and statements had the potential to influence the Government's payment decision and was material to the Government's decision to pay the claims.

118.     The United States paid the false or fraudulent claims.

119.     KBR's making or use of false records and statements were foreseeable factors in the United States' loss and a consequence of KBR's schemes.  Due to KBR's actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## PRAYER FOR RELIEF

120.     WHEREFORE, Relator respectfully requests that the Court enter judgment against the Defendant and award the following:

(1) Damages in the amount of three (3) times the actual damages suffered by the United States as a result of Defendant's conduct;

(2) Civil penalties against Defendant up to the maximum allowed by law for each violation of 31 U.S.C. § 3729;

(3) The maximum award Relator may recover pursuant to 31 U.S.C. § 3730(d);

(4) All costs and expenses of this litigation, including attorneys' fees and costs of court; and

(5) All other relief on behalf of Relator or the United States that the Court deems just and proper.

C.     COUNT III – RETALIATION (31 U.S.C. § 3730(h))

121.     Relator alleges and incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

122.    In violation of 31 U.S.C. § 3730(h), KBR took negative employment actions and discriminated against Relator Knudsen in response to his lawful acts conducted in furtherance of efforts to stop Defendant from committing violations of the False Claims Act.

123.    As a result of KBR's retaliation, Knudsen has suffered negative employment consequences including harassment, threats, being overlooked for promotion, impeding his ability to receive proper medical care, and terminating his employment. As a result, Knudsen has suffered economic damages.

**PRAYER FOR RELIEF**

124.    Relator prays that the Court enter judgment against Defendant for the following:

    (1)  Two times the amount of Relator's back pay;

    (2)  Interest on Relator's back pay;

    (3)  Compensation for special damages sustained by Relator as a result of Defendant's actions;

    (4)  Litigation costs and attorney fees; and

    (5)  Any other relief the Court deems just and proper to make the Relator whole.

**XII.  INDEX OF EXHIBITS**

125.    The documentary evidence referenced herein consists of the following:

| Exhibit No. | Document Description | Bates Number |
|:---:|:---:|:---|
| 1 | Adam Knudsen Employment Agreement | REL000001– REL000018 |

**XIII.  DEMAND FOR JURY TRIAL**

126.    Pursuant to Federal Rule of Civil Procedure 38, Relator demands a trial by jury.

Respectfully submitted,

BERG & ANDROPHY

Sarah M. Frazier
Texas State Bar No. 24027320
Joel M. Androphy
TX State Bar No. 01254700
Janis G. Gorton (*Admission Pending*)
TX State Bar No. 24071063
Michael J. Hurta (*Admission Pending*)
TX State Bar No. 24097860
3704 Travis Street
Houston, Texas 77002
Telephone (713) 529-5622
Facsimile (713) 529-3785

ATTORNEYS IN CHARGE FOR
RELATOR ADAM KNUDSEN

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2018, a true and correct copy of this Original Complaint was forwarded to the United States Attorney's Offices for the Central District of Illinois and the Department of Justice in Washington, D.C. via certified mail, return receipt requested.

Sarah M. Frazier

I